STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH VINCENT SLOCKBOWER, DEFENDANT-APPELLANT.

Argued May 9, 1978—Decided January 12, 1979.

(1)

*Mr. Jon P. Campbell* argued the cause for appellant (*Mr. Eric A. Summerville,* attorney).

*Mr. Lawrence H. Posner,* Assistant Prosecutor, argued the cause for respondent (*Mr. James T. O'Halloran,* Prosecutor, attorney).

*Mr. David R. Arrajj,* designated counsel, argued the cause for *amicus curiae* Public Defender of New Jersey (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. William F. Lamb,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

4

CONFORD, P. J. A. D. (temporarily assigned). ██ This appeal presents the question whether under the federal[1] and State[2] constitutional provisions concerning search and seizure the police may routinely impound a motor vehicle and in the course thereof inventory its contents on the occasion of the arrest of its driver for a motor vehicle offense. We hold such action by the police to be an unconstitutional invasion of the driver's zone of privacy unless the driver either consents or is given a reasonable opportunity to make other arrangements for the custody of the vehicle.

On March 13, 1975 defendant was arrested by Jersey City police on an outstanding warrant for driving a motor vehicle while on the revoked list. He was at the time driving an automobile registered to his wife. The vehicle was impounded and searched on the spot. The search turned up a pen gun and ammunition and defendant was charged with and indicted for statutory criminal violations in that regard. Defendant was successful on a motion to suppress the evidence for illegality of the search. The Appellate Division granted the State's motion for leave to appeal, and, by a divided vote, reversed. 145 *N. J. Super.* 480 (1976). We granted leave to defendant to appeal to this Court. 74 *N. J.* 255 (1977).

Three members of the Jersey City Narcotics Squad were on duty in an unmarked vehicle on the afternoon of the date in question. Two of them recognized defendant, whom they knew, driving a car. They had unsuccessfully executed a search warrant at his home two years before. They were also aware that a warrant for his arrest for driving on the revoked list was outstanding. Defendant was motioned over to a street intersection and stopped. As he stepped out of the

[1]United States Constitution, Amendment IV.

[2]*N. J. Const.* 1947, Art. I, par. 7. The State and federal provisions are essentially the same in wording. We are free, however, to construe the State provision more broadly in favor of privacy than the federal. *State v. Johnson*, 68 *N. J.* 349, 353 (1975).

vehicle he was placed under arrest. The car was searched at once and a .22 caliber pen gun and a box of .22 caliber ammunition were found in the closed but unlocked glove compartment.

On the motion to suppress, arresting Detective Roth testified that it is standard procedure for "the safekeeping of the vehicle" to impound a vehicle and inventory its contents when the driver has been arrested. This was the only justification for the search given by the police — a valid inventory of an impounded vehicle. However, no impounded vehicle report was filled out until after the car was taken to a precinct station and a second search conducted. The report was then completed and the vehicle taken to a car pound. The reason for the impoundment listed on the police report is "Pen gun found in auto." In fact no detailed report of the contents of the car was made. Despite the fact that various tools were in the car the report lists them collectively as "numerous tools."

Judge Thuring, sitting as motion judge, held there was no valid justification for the impoundment. There was no statutory mandate therefor; the car was neither disabled on the roadway nor a nuisance; it could have been safely parked and locked at the scene since the neighborhood was not dangerous. The judge expressed his disbelief that the impoundment was pursuant to any standard procedure. Noting that the inventory report stated as the reason for the impoundment the finding of the pen gun in the car, he concluded that the search preceded the impoundment and that the impoundment had been a pretext to justify the prior search.

In reversing, the Appellate Division majority relied on *South Dakota v. Opperman*, 428 *U. S.* 364, 96 *S. Ct.* 3092, 49 *L. Ed.* 2d 1000 (1976), decided some six months after the grant of the suppression motion. The court found that *Opperman* was controlling and that "[i]t recognized and approved the standard police procedure of impounding, inventorying and taking custody of a car when its occupant

is arrested and removed therefrom." 145 *N. J. Super.* at 484. It further found that the detectives acted reasonably in this case in following police regulations. The court cited *N. J. S. A.* 39 :4–136 as additional support for the police action. The motion judge's finding that the car was searched before it was impounded was rejected as having no support in the record. In dissent from the Appellate Division decision, Judge Botter distinguished *Opperman* on the ground that it involved a parked, unoccupied vehicle in violation of overnight parking restrictions whereas in the instant case there **was** no indication that defendant could not have lawfully parked the car and arranged to have it picked up by his wife or someone else. He would have required that where an arrest is solely for a motor vehicle offense and the vehicle can be lawfully parked and is not needed as evidence the consent of the owner or operator of the car should be obtained by the police before its impoundment. 145 *N. J. Super.* at 491. It was also Judge Botter's view that the motion judge's finding that the search preceded the impoundment should have been sustained.

There is a substantial body of authority considering the circumstances under which, consistent with constitutional strictures against unreasonable searches or seizures, police may or may not take custody of (impound) a motor vehicle and inventory its contents, necessarily involving a prior search of the vehicle. See Annot. 48 *A. L. R.* 3d 537 (1973). This Court has not had prior occasion to deal with the subject in any context comparable to the instant situation. In *State v. Hock,* 54 *N. J.* 526 (1969), *cert.* den. 399 *U. S.* 930, 90 *S. Ct.* 2254, 26 *L. Ed.* 2d 797 (1970), an impoundment and search were upheld on probable cause to believe the car was stolen. There is no need here to consider the area of exceptions to the warrant requirement in relation to the search of a car stopped in motion on probable cause to believe the vehicle contains seizable objects, see *Chambers v. Maroney,* 399 *U. S.* 42, 90 *S. Ct.* 1974, 26 *L. Ed.* 2d 419 (1970), or a search incident to the valid arrest of an occupant

or driver, see *Preston v. United States,* 376 *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed.* 2d 777 (1964), as neither of these exceptions to the warrant requirement is argued to exist here. Further, although by reason of the mobility and other characteristics of a motor vehicle, it is recognized that the search and seizure of a car may be found reasonable in circumstances where that of a home or office would not, see *State v. Boykins,* 50 *N. J.* 73 (1967), nevertheless it remains the law that motor vehicles constitute areas of privacy of persons and effects within the general protection of the Fourth Amendment and our own Constitution. *United States v. Ortiz,* 422 *U. S.* 891, 896, 95 *S. Ct.* 2585, 45 *L. Ed.* 2d 623 (1975) ; *Coolidge v. New Hampshire,* 403 *U. S.* 443, 461, 91 *S. Ct.* 2022, 29 *L. Ed.* 2d 564 (1971) ; *Marshall v. Barlow's Inc.,* 436 *U. S.* 307, 315 *note* 10, 98 *S. Ct.* 1816, 56 *L. Ed.* 2d 305 (1978).

The problem for resolution in the present case does not extend to a survey of the general legitimacy of a police impoundment *and* inventory of the contents of a vehicle as the facts here presented compel the conclusion that there was no valid impoundment in the first instance but rather an unjustifiable investigatory search in the pretended guise of an impoundment and routine inventory.

The recent decision of the United States Supreme Court in *South Dakota v. Opperman, supra,* 428 *U. S.* 364, 96 *S. Ct.* 3092, 49 *L. Ed.* 2d 1000, is of only limited significance in this regard. In that case the Court framed the issue in terms of the justification to search a "lawfully impounded" vehicle. *Id.* at 365, 96 *S. Ct.* 3092. The vehicle in *Opperman* was illegally parked overnight in an area of town where parking on the streets was not permitted from 2 A.M. until 6 A.M. It was ticketed at 3 A.M. and again at 10 A.M. for an overnight parking violation. Shortly thereafter, the vehicle was towed to the city impound lot. Articles of value were observed from outside the car. The police unlocked the door and searched the interior, including the unlocked glove

compartment, using a standard inventory form to list the contents. "Standard police procedures" were followed. A bag of marijuana was found in the glove compartment. In the subsequent prosecution for possession of the drug defendant moved to suppress the evidence. A denial of that motion was reversed by the Supreme Court of South Dakota on grounds of violation of the Fourth Amendment. On *certiorari*, the Supreme Court reversed. The Court broadly implied approval of police assuming custody of vehicles as part of the "community caretaking functions" in various contingencies such as vehicle accidents and violation of parking ordinances jeopardizing "the public safety and the efficient movement of vehicular traffic." 428 *U. S.* at 368–369, 96 *S. Ct.* at 3097. The Court found that after a valid impoundment "local police departments generally follow a routine practice of securing and inventorying the automobiles' contents." *Id.* at 369, 96 *S. Ct.* at 3097. Three purposes for inventorying were discerned: protection of the owner's property while it remains in police custody; the protection of the police against claims over lost property; and the protection of the police from potential danger. *Ibid.*

While the *Opperman* plurality (Justice Powell filed a concurring opinion) stated that "these caretaking procedures" had "almost uniformly" been upheld by the state courts, 428 *U. S.* at 369, 96 *S. Ct.* 3092, there has been a substantial and growing minority of jurisdictions which have insisted upon a factual showing of substantial police need, in the light of the constitutional regard for the privacy interests of automobile drivers, before approving the impoundment of a motor vehicle. *Mozzetti v. Superior Court of Sacramento County,* 4 *Cal.* 3d 699, 94 *Cal. Rptr.* 412, 484 *P.* 2d 84 (S. Ct. 1971); *People v. Miller,* 7 *Cal.* 3d 219, 101 *Cal. Rptr.* 860, 496 *P.* 2d 1228 (S. Ct. 1972); *State v. Boster,* 217 *Kan.* 618, 539 *P.* 2d 294 (S. Ct. 1975); *State v. Singleton,* 9 *Wash. App.* 327, 511 *P.* 2d 1396 (Ct. App. 1973); *State v. Hardman,* 17 *Wash. App.* 910, 567 *P.* 2d 238 (Ct. App. 1977); *Granville*

*v. State,* 348 *So.* 2d 641 (Fla. Dis. Ct. App. 1977); *State v. Goodrich,* 256 *N. W.* 2d 506 (Minn. S. Ct. 1977); *State v. McCranie,* 137 *Ga. App.* 369, 223 *S. E.* 2d 765 (Ct. App. 1976); *City of Danville v. Dawson,* 528 *S. W.* 2d 687 (Ky. Ct. App. 1975); *Duncan v. State,* 281 *Md.* 247, 378 *A.* 2d 1108, 1116 (Ct. App. 1977); *Dixon v. State,* 23 *Md. App.* 19, 327 *A.* 2d 516 (Ct. Sp. App 1974); *State v. Jewell,* 338 *So.* 2d 633 (La. Sup. Ct. 1976); *United States v. Pannell,* 256 *A.* 2d 925 (D. C. Ct. App. 1969). Federal decisions in general accord are *United States v. Lawson,* 487 *F.* 2d 468 (8 Cir. 1973); *United States v. Edwards,* 554 *F.* 2d 1331 (5 Cir. 1977); *United States v. Hellman,* 556 *F.* 2d 442 (9 Cir. 1977). See also *State v. McDaniel,* 156 *N. J. Super.* 347 (App. Div. 1978).

It has been persuasively stated in a number of cases, in seeking a rationale that would duly balance the right of privacy against legitimate police safekeeping functions, that if the circumstances that bring a vehicle properly to the attention of the police are such that its driver, even though arrested, is able to make his own arrangements for its custody, or if the vehicle can be conveniently parked and locked without constituting an obstruction of traffic or other public danger, the police should permit that action to be taken rather than impound it against the will of the driver and thereafter search it routinely. Thus, in *State v. Goodrich, supra,* defendant had been arrested for driving while intoxicated. His mother and brother quickly arrived at the scene after defendant telephoned them with police permission from a service station across the street.

We hold that where police assumed custody of defendant's automobile for no legitimate state purpose other than safekeeping, and where defendant had arranged for alternative means, not shown to be unreasonable, for the safeguarding of his property, impoundment of defendant's automobile was unreasonable and, therefore, the concomitant inventory was, an unreasonable search under the Fourth Amendment. We accordingly reverse.

[256 *N. W.* 2d at 507]

In determining the reasonableness of an impoundment, the court posited the following test:

> The state's interest in impounding must outweigh the individual's Fourth Amendment right to be free of unreasonable searches and seizures; although the expectation of privacy with respect to an automobile is significantly less than the traditional expectation of privacy associated with the home, this interest is still constitutionally protected, *South Dakota v. Opperman, supra.*
>
> [256 *N. W.* 2d at 510]

Likewise, in *Altman v. State,* 335 *So.* 2d 626 (Fla. App. 1976), defendant crashed his car in a high speed chase with the police. He was arrested and attempted to have a friend at the scene take over control of his vehicle. The court found impoundment in this instance to be unnecessary.

> A common pattern running through these cases is that the police must act in good faith and not use the inventory procedure as a subterfuge for a warrantless search of a vehicle. A prime criterion to determine if the police have taken lawful custody of a motor vehicle is whether or not it is justifiable for the police, acting under routine police procedure, to become bailees of the vehicle. Here it was stipulated the defendant desired and had the ability to have his car removed by someone without intervention of the police. Therefore, the underlying necessity for police custody did not exist. When the driver of a motor vehicle is arrested and a reliable friend is present, authorized and capable to remove an owner's vehicle which is capable of being safely removed; or where the arrestee expresses a preference as to towing service and designates an appropriate carrier and destination for the vehicle, it is unnecessary for the police to impound it. In either of these instances the rationale for an inventory search does not exist.
>
> [335 *So.* 2d at 629; footnote omitted]

In accord with the foregoing views are the decisions in *State v. Hardman, supra,* 567 *P.* 2d at 241 (officer must first explore and thereafter reasonably discard alternatives to impoundment); *State v. Boster, supra,* 539 *P.* 2d at 300 (car driven by arrestee was owned by a passenger in a second following car, who could have taken possession); *City of Danville v. Dawson, supra,* 528 *S. W.* 2d at 690–691 ("* * *

ordinarily it should be just as easy to reach some person at his home as it is to call a wrecker [in order to impound] * * * the practice of impounding vehicles for mere traffic violations is utterly unnecessary and, indeed, is of questionable legality"); *People v. Landa,* 30 *Cal. App.* 3d 487, 106 *Cal. Rptr.* 329, 331–332 (Ct. App. 1973) (arrest on traffic warrant; the car could "have been locked and left unattended. The situation would have been no different had defendant himself voluntarily parked the vehicle, locked and left it").

The pertinent principle was recently given application by our Appellate Division in *State v. McDaniel, supra.* A vehicle in which defendant was a passenger was detained by police for an "erratic stop" and in the course of checking credentials the police ascertained that the driver was "wanted on a bench warrant" and arrested him. The driver asked whether the defendant could take the car but the police refused and took the car to the police station. There the car was searched "for valuables and any contraband." A quantity of bags of heroin was disclosed in the search. In reversing the denial of a motion to suppress the heroin, the court pointed out, among other things, that the police had an alternative to impoundment, *i. e.,* turning the car over to defendant. 156 *N. J. Super.* at 356. Moreover, said the court, either of the occupants could have moved the vehicle to a lawful parking area and locked it. *Ibid.* In these circumstances the decision to "impound" the car was unreasonable because unnecessary. *Id.* at 356–357. *Cf. State v. Roberson,* 156 *N. J. Super.* 551 (App. Div. 1978); *State v. Jones,* 122 *N. J. Super.* 585 (Cty. Ct. 1973).

The application of the foregoing principles to the present case does not present any conflict with *South Dakota v. Opperman, supra,* on its facts. As pointed out by Judge Botter in his dissent below, the owner of the car in *Opperman* had left his car in a state of multiple continuing violations of a prohibitory parking ordinance and was not present to make other arrangements for the care of his belongings when the police properly became concerned with the vehicle. 145 *N. J. Super.* at 488. See 428 *U. S.* at 375, 98 *S. Ct.* 3092 and *Cady*

v. *Dombrowski,* 413 *U. S.* 433, 443, 93 *S. Ct.* 2563, 37 *L. Ed.* 2d 706 (1973). When the instant defendant was apprehended, there appears by contrast to have been no reason why defendant could not have been permitted to park his car properly and lock it, just as he would have done if he had had any business in the neighborhood. If there was any appropriate concern by the police for the safety of the car until defendant could obtain his release[3] he could have been given the opportunity to summon his wife, the owner of the car, to take possession of it. Had any of these alternative recourses been taken, the police would have had no basis for reasonable concern for the protection of defendant's property, for their own potential liability as bailees for lost articles or for their own safety,[4] assuming, as is not inconsistent with the record, that they ever genuinely entertained any such purposes in their actions under review here.

■■■ The point to be made is that constitutional rights to privacy in vehicles and effects must be accorded respect by police as well as courts and cannot be subordinated to mere considerations of convenience to the police short of substantial necessities grounded in the public safety. The burden of establishing such necessity in any given case of claimed right to impound and inventory a car rests on the police. As aptly put in *Chimel v. California,* 395 *U. S.* 752, 764–765, 89 *S. Ct.* 2034, 2041, 23 *L. Ed.* 2d 685 (1969), the "reasonableness" of a search is to be assayed on considerations "relevant to Fourth Amendment interests," not on "a subjective view regarding the acceptability of certain sorts of police conduct."

---

[3]The arrest warrant indicated defendant was bailable on $250 bond, and he was in fact so released a few hours after his arrest.

[4]In view of these conclusions we have no present occasion to appraise the validity of any of these commonly advanced reasons for the reasonableness of a routine impoundment inventory. But see the detailed criticism thereof by the California Supreme Court in *Mozzetti v. Superior Court of Sacramento County, supra,* 484 *P.* 2d at 88–91.

Any contrary approach would create a temptation for police to use the unconnected temporary predicament of a motorist as a pretext for an investigatory search unauthorized by a warrant. See Moylan, "The Inventory Search Of An Automobile — A Willing Suspension of Disbelief," 5 *Balt. L. Rev.* 203 (1976); Miles and Wefing, "The Automobile Search and the Fourth Amendment: A Troubled Relationship," 4 *Seton Hall L. Rev.* 105, 143, 144 (1972); Note, 87 *Harv. L. Rev.* 835, 848–853 (1974).

We also find ourselves in disagreement with the Appellate Division determination that *N. J. S. A.* 39:4–136 justified the police action here. This was not a case, as implied by that court, 145 *N. J. Super.* at 485, of a motor vehicle "which cannot be moved by the operator, or is improperly parked and left unattended upon a roadway."

▮ Accordingly, we hold, in agreement with Judge Thuring's ruling at motion level, that the circumstances which the State here argues constituted a justification for a standard impoundment and inventory did not measure up in terms of substantial necessity to the criteria therefor formulated above. For this reason, even were there no other, the search would have to be condemned under the federal and State constitutions and the order of the motion judge sustained.

▮ But there is yet another ground for condemning the search. We conclude there was substantial credible evidence to support the findings of the motion judge that the search in this case was not pursuant to an impoundment but prior to it and that the purported impoundment was pretextual. In effect, the ruling was that the purpose of the police was an investigatory search not based on probable cause rather than a *bona fide* impoundment for proper safekeeping purposes. If nothing else, the written notation on the police report of the reason for impoundment as "Pen gun found in auto" would amply justify the finding of the judge. For this additional reason, consequently, the search was illegal and the evidence subject to suppression. See *State v. McDaniel, supra,* 156

*N. J. Super.* at 358, 359; *Dixon v. State, supra; Pigford v. United States, supra; Granville v. State, supra; State v. Jewell, supra; United States v. Edwards, supra;* and *United States v. Hellman, supra.*

The conclusions thus arrived at require a reversal of the judgment of the Appellate Division without the necessity of considering the question as to the extent to which a search of an impounded vehicle may be made, assuming the impoundment itself is reasonable and valid. Contrast the views expressed in *South Dakota v. Opperman,* 428 *U. S.* at 372, 96 *S. Ct.* 3092 (glove compartment); *In re One 1965 Econoline, etc.,* 109 *Ariz.* 433, 511 *P.* 2d 168 (Sup. Ct. 1973) (satchel); *Mozzetti v. Superior Court of Sacramento County, supra* (only articles in plain view); *State v. Bradshaw,* 41 *Ohio App.* 2d 48, 322 *N. E.* 2d 311 (Ct. App. 1974) (improper to open trunk); and *Williams v. State,* 557 *P.* 2d 135 (Wyo. Sup. Ct. 1976) (trunk properly searched). Problems of some difficulty may be presented in this regard and we regard it as prudent to reserve such questions for disposition on a case-by-case basis as they arise.

The concurring opinion of Justice Schreiber disputes the assumption in this opinion that a warrantless search is *prima facie* invalid and becomes valid only if it falls within a specific exception to the warrant requirement carved out by the United States Supreme Court. Justice Schreiber would find a warrantless search valid if "reasonable" without the necessity of subsuming the particular situation under one of the "exceptions" (pp. 18–22). We do not regard this appeal as an appropriate vehicle for extended discussion of the validity of the assumption to which Justice Schreiber takes exception. It will suffice to point out that numerous decisions of the United States Supreme Court support our view, *e.g., Marshall v. Barlow's Inc.,* 436 *U. S.* 307, 313, 98 *S. Ct.* 1816, 56 *L. Ed.* 2d 305 (1978), and see the companion opinion of the Court in *State v. Ercolano,* 79 *N. J.*

25, 41 (1978), decided this day, and that this Court has recently already embraced that proposition. *State v. Sims,* 75 *N. J.* 337, 351 (1978).

While some consider the so-called inventory search a separate exception to the warrant requirement, it would seem to us to constitute a sub-species of the exception denominated "exigent circumstances." The necessity for the initial impoundment preceding the search is grounded in the public safety and good order thought to be implicated in the sudden temporary abandonment of a motor vehicle on the public streets. The development of the doctrine and of its limitations will undoubtedly reflect the views of the courts as to the seriousness of the asserted exigency in the particular case as against the degree of privacy of the car owner invaded by the action of the police.

The judgment of the Appellate Division is reversed and the order suppressing the articles found in the car is reinstated.

PASHMAN, J., concurring. I concur in the opinion of the Court subject to the qualifications expressed in my concurring opinion in *State v. Ercolano,* 79 *N. J.* 25 (1979), filed today. Although defendant's vehicle, unlike the one involved in *Ercolano,* was not lawfully parked at the time of the arrest — inasmuch as the police spotted defendant while the vehicle was in motion and forced him to pull over to the curb — nevertheless there did not exist any "substantial police need" to subject the vehicle to impoundment. There was no showing that the police could not have conveniently parked and locked the car or that defendant, even though arrested, could not have made his own arrangements to have the car moved. This seizure was therefore unnecessary to the attainment of any lawful police objective, and hence illegal.

Accordingly, I agree that the judgment of the Appellate Division should be reversed, and the order suppressing the evidence reinstated.

SCHREIBER, J., concurring. This case should properly turn on the issue of whether there was sufficient support in the record for the trial court's factual findings(1) that the defendant's vehicle had been searched before its impoundment, (2) that the impoundment had not been made pursuant to a standard procedure, and (3) that the impoundment had been a "pretext" to justify the search.[1] Having examined and analyzed the record, I am generally in accord with the following comments of Judge Botter in his dissenting opinion below:

There was substantial credible evidence supporting these findings, and they should not be disturbed in this court. *State v. Johnson,* 42 *N. J.* 146, 162 (1964). * * * The testimony indicates that the search was a pretext for a criminal investigative motive. The arresting officer was a member of the narcotics squad. He testified that he discovered the outstanding traffic warrant by examining the warrant files in different precincts. He had previously executed a search warrant at defendant's residence without success. In addition, there was no need to examine the glove compartment at the scene. Defendant had been removed from the vehicle and the officer testified that he did not suspect that the vehicle contained a weapon, nor did he fear defendant. In fact, two officers were present. While no finding was made that the claimed seizure of the vehicle was a pretext for a criminal investigation, this evidence buttresses the trial judge's findings that the search occurred before the officers intended to impound the vehicle. [145 *N. J. Super.* 480, 493 (1976)]

Although not every traffic violation will justify a search of every part of a vehicle, if a traffic violator is arrested and taken into custody, the police may properly search the car

---

[1] The trial court mistakenly stated that the State had the burden of proving by clear and convincing evidence that probable cause existed for the search. The burden is by a fair preponderance of the evidence. See *R.* 3:5-7(b) and *Pressler, Current N. J. Court Rules,* Comment *R.* 3:5-7(b) at 370 (1978). See also, *e. g., State v. Whittington,* 142 *N. J. Super.* 45, 51-52 (App. Div. 1976). This issue has not been raised, considered or briefed by the parties. However, it is clear from the trial court's analysis that it would have reached the same factual conclusions irrespective of the standard applied.

for weapons if they reasonably believe it necessary for protection or to prevent an escape. *State v. Boykins,* 50 *N. J.* 73, 77 (1967). Here the trial court found that the defendant was arrested after he stepped out of the car and that the police officer stated the search was not made for safety reasons. Apparently the defendant was transported to police headquarters in the detective's car so there was no necessity to search the defendant's automobile for weapons in connection with its use. Therefore, the search in this case was unreasonable because there was no nexus between the arrest and the search. *Cf. State v. Zito,* 54 *N. J.* 206 (1969) (warrantless search of automobile trunk proper where occupants arrested for failing to give good account of themselves and suspected of involvement in burglary).

The majority's holding that impounding a vehicle and inventorying its contents in accordance with routine police procedures when the driver is arrested for a motor vehicle offense is an "unconstitutional invasion of the driver's zone of privacy unless the driver either consents or is given a reasonable opportunity to make other arrangements for the custody of the vehicle" is too sweeping a declaration. I would hope that the majority would at least permit detention of the vehicle during questioning of the driver at the scene, for information so derived may give rise to a basis justifying a search.

Even more important is my disagreement with the underlying philosophy of the majority opinion as to the Fourth Amendment.

Chief Justice Burger, writing for the Court in *South Dakota v. Opperman,* 428 *U. S.* 364, 96 *S. Ct.* 3092, 49 *L. Ed.* 2d 1000 (1976), stated that the proper test to be applied in measuring the propriety of a motor vehicle search was whether the search in light of all the circumstances was unreasonable. He quoted approvingly from Mr. Justice Black's last writing on the Fourth Amendment:

The Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only *"unreasonable* searches and seizures." The relevant test *is not the reasonableness of the opportunity to procure a warrant,* but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts. [428 *U. S.* at 373, 96 *S. Ct.* at 3099, 49 *L. Ed.* 2d at 1007 (emphasis in original), quoting from *Coolidge v. New Hampshire,* 403 *U. S.* 443, 509–510, 91 *S. Ct.* 2022, 2059–2060, 29 *L. Ed.* 2d 564, 608 (1971) (Black, J., concurring and dissenting)]

Instead of fashioning the question pursuant to this guideline, the majority assumes that the Fourth Amendment requires that warrants must always be obtained before any search is permissible unless the search falls within certain limited exceptions.[2]

A comparison of the approach suggested by Chief Justice Burger and that endorsed by the majority in this case illustrates the two competing theories that have evolved in

---

[2]Supreme Court opinions have wavered between these concepts. Compare *Trupiano v. United States,* 334 *U. S.* 699, 705, 68 *S. Ct.* 1229, 1232, 92 *L. Ed.* 1663, 1669 (1948) (adopting the "cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable") with *United States v. Rabinowitz,* 339 *U. S.* 56, 66, 70 *S. Ct.* 430, 435, 94 *L. Ed.* 653, 660 (1950) (holding that the test "is not whether it is reasonable to procure a search warrant, but whether the search was reasonable"). Although *Chimel v. California,* 395 *U. S.* 752, 89 *S. Ct.* 2034, 23 *L. Ed.* 2d 685 (1969), returned to the philosophy of *Trupiano,*, in *Cady v. Dombrowski,* 413 *U. S.* 433, 439, 448, 93 *S. Ct.* 2523, 2531, 37 *L. Ed.* 2d 706, 713, 718 (1973), the Court referred to reasonableness as the "ultimate standard" and declared "[t]he Framers of the Fourth Amendment have given us only the general standard of 'unreasonableness' as a guide in determining whether searches and seizures meet the standard of that Amendment in those cases where a warrant is not required." Professor Weinreb commented in 1974 that "for the moment, the seesaw between the two clauses of the amendment is tilted away from the warrant clause." "Generalities of the Fourth Amendment," 42 *U. Chi. L. Rev.* 47, 77 (1974). Since then both views have been expressed. Compare *South Dakota v. Opperman, supra,* with *Mincey v. Arizona,* 437 *U. S.* 385, 98 *S. Ct.* 2408, 57 *L. Ed.* 2d 290 (1978), which emphasized the warrant clause concept.

construing the Fourth Amendment. The language of the Amendment bears repeating:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [U. S. Const., Amend. IV][3]

The Amendment consists of two distinct clauses which are not connected. People should be secure against unreasonable searches and no warrants shall issue except upon probable cause. The sentence does not read that warrantless searches are unreasonable. Rather, the first clause sets down the ultimate standard that searches shall not be unreasonable, irrespective of the particular requirements of the warrant clause; whereas the second clause establishes the test of reasonableness for a specific type of search.

Constitutional history sheds some light on this dichotomy in the Amendment and suggests that many types of searches did not require warrants.[4] In colonial days concern centered on general warrants which had been used to accomplish unreasonable and oppressive searches. *T. Taylor, Two Studies in Constitutional Interpretation* 41 (1969). In 1761 the use of general warrants to enforce the revenue laws was vigorously attacked in court by the Boston merchants, but to no avail. 2 *Legal Papers of John Adams* 106–147 (Wroth and Zobel ed. 1965). Enforcement of these warrants provoked

---

[3]The phraseology of the State Constitution is virtually the same. *N. J. Const.* (1947), Art. I, par. 7.

[4]Mr. Justice Powell has acknowledged that: "The Court on occasion has also looked to history to discern whether certain types of government intrusion were perceived to be objectionable by the Framers of the Fourth Amendment. See United States v. Chadwick, 433 U. S. [1], at 7–9 [97 *S. Ct.* 2476, 53 *L. Ed.* 2d 538]." *Rakas v. Illinois,* —— *U. S.* ——, ——, 99 S. Ct. 421, 435, 58 *L. Ed.* 2d 387, 407 (1978) (Powell, J., concurring).

violent opposition. They were an anathema in the colonies. *Taylor, supra* at 38; *Boyd v. United States,* 116 *U. S.* 616, 624–625, 6 *S. Ct.* 524, 529, 29 *L. Ed.* 746, 749 (1886). Taylor concludes that our constitutional framers were disturbed by the use of the general warrant rather than warrantless searches. *Taylor, supra* at 41. He asserts that the constitutional provision that a warrant shall issue upon probable cause and with sufficient particularity was inserted to eliminate this specific evil.

Equally significant at the time was the routine practice of searching a felon and the place in which he was found without a warrant. *Taylor, supra* at 29. No disquiet was evidenced about such searches and the constitutional safeguard inserted was that such searches be reasonable. *Marshall v. Barlow's, Inc.,* 436 *U. S.* 307, 327, 98 *S. Ct.* 1818, 1828, 56 *L. Ed.* 2d 305, 321 (1978) (Stevens, J., dissenting). Thus the warrant clause established one category of reasonable searches, the framers recognizing that the standard of reasonableness might in some instances require a warrant and in others not.

Therefore, those types of searches which, without some procedural safeguards, might come to resemble the searches conducted under the general warrants of colonial times, most clearly fall within the group requiring warrants. Beyond that, it is for the courts to determine whether and to what extent reasonableness requires conformity to the warrant clause. The difficulty arises when the court is faced with circumstances, purposes or objects which were not considered by the framers. Thus, for example, when the Supreme Court has considered the application of the Fourth Amendment to administrative searches, there seems to be general agreement that reasonableness requires something less than strict application of the warrant clause. Compare the majority and dissenting opinions in *Marshall v. Barlow's, Inc., supra.* (The majority, although requiring a warrant, diluted the concept of probable cause and the dissent would have eliminated the need for a warrant.) Similarly *South Dakota v. Opperman,*

*supra,* and *Cady v. Dombrowski,* 413 *U. S.* 433, 93 *S. Ct.*
2523, 37 *L. Ed.* 2d 706 (1973), suggest that reasonableness
does not require compliance with the warrant clause when the
purpose of the search is benign as distinguished from the in-
vestigation of criminal activities.

The so-called exceptions to the warrant requirement are
really categories of searches which, in terms of purpose, place
or circumstances, differ from those searches which the war-
rant clause was clearly designed to cover. For example, a
search incident to an arrest is designed to protect the police
(different purpose) and is directed toward evidence of a spe-
cific crime for which the suspect has been arrested (circum-
stances not like the general warrant.) Thus reasonableness
can be satisfied by a standard different than that contained
in the warrant clause. *Cf. State v. Boykins,* 50 *N. J.* 73, 78
(1967), where Chief Justice Weintraub wrote:

> The Fourth Amendment forbids only such searches as are un-
> reasonable. The familiar doctrine that a search may be made as
> an incident to an arrest does not exhaust the subject of reason-
> able searches without a warrant. Rather it represents merely a
> category of reasonable searches.

When the warrant clause is thus read as merely stating
the reasonableness standard to be applied in a particular
factual setting, the first clause can then be seen as embodying
the ultimate standard against which to determine the legality
of searches and seizures. When confronted with purposes,
objects or circumstances not envisioned by the framers, the
wiser, and indeed the proper course is to apply the reasonable-
ness clause; not to automatically force the new situation into
the warrant clause category. Upon considering the nature
of a particular class of searches, a court may well determine
that reasonableness requires compliance with the warrant re-
quirements.

In the case before the Court, we are dealing with an object
not within the contemplation of the framers—the automobile.
The majority insists on applying the warrant requirement to

searches of those objects, allowing warrantless searches only when one of the narrow "exceptions" applies, [79 *N. J.* at 15]. This rigid interpretation ignores the long line of Supreme Court cases that have determined, in essence, that the greater mobility of automobiles and the reduced expectations of privacy associated with them allow some standard of reasonableness other than the warrant requirement. *Marshall v. Barlow's, Inc., supra* at 315 n. 10, 98 *S. Ct.* at 1822 n. 10, 56 *L. Ed.* 2d at 313 n. 10.[5] Indeed, rather than being the general rule with respect to automobiles, the warrant requirement is the narrow exception. *Cf. Cardwell v. Lewis,* 417 *U. S.* 583, 593, 94 *S. Ct.* 2464, 2470, 41 *L. Ed.* 2d 325, 336 (1974), distinguishing *Coolidge v. New Hampshire,* 403 *U. S.* 443, 91 *S. Ct.* 2022, 29 *L. Ed.* 2d 564 (1971), on the ground that the car in *Coolidge* was parked in a private driveway. This Court has recognized that "[i]t is important that we keep in mind the nature of the thing searched. * * * [W]arrantless searches of automobiles may be valid in situations which would not justify warrantless searches of homes and offices." *State v. Gray,* 59 *N. J.* 563, 568 (1971).

The approach which I am advocating here is the one which was repeatedly expounded by Chief Justice Weintraub. His analysis of search and seizure questions began with the premise that only unreasonable warrantless searches are proscribed by the Fourth Amendment. In *State v. Davis,* 50 *N. J.* 16 (1967), *cert.* den. 389 *U. S.* 1054, 88 *S. Ct.* 805, 19 *L. Ed.* 2d 852 (1968), he wrote:

The Fourth Amendment does not bar all searches and seizures. It bars only those that are "unreasonable." *The concepts developed in this area remain subordinate to that ultimate standard.* The ques-

---

[5]That footnote recites that "[t]he fact that automobiles occupy a special category in Fourth Amendment case law is by now beyond doubt, due, among other factors, to the quick mobility of a car, the registration requirements of both the car and the driver, and the more available opportunity for plain-view observations of a car's contents."

tion, then, is whether what was done must be said on the total factual complex to be "unreasonable." [50 *N. J.* at 22 (emphasis supplied)]

He reminded us that offsetting factors — the individual's right to be protected from crime and the public's interest in police efforts to prevent crime — must be considered and weighed against the intrusion upon the privacy of and the inconvenience to the individual. The Chief Justice forcefully and carefully described those interests in *State v. Boykins,* 50 *N. J.* 73 (1967), a case involving an automobile search.

We must recur to the basic proposition that the Fourth Amendment bars only searches that are unreasonable. "Since the Fourth Amendment speaks, not in terms that are absolute, but rather of unreasonableness, it necessarily calls for a continuing reconciliation of competing values. Pre-eminent in the galaxy of values is the right of the individual to live free from criminal attack in his home, his work, and the streets." *State v. Davis,* 50 *N. J.* 16 (1967). That primary individual right demands that government be equal to the reason for its being — the protection of the individual citizen, and in deciding whether a search is unreasonable if the officer does not know precisely what it will uncover, we must keep in mind that the police have a preventive role as well as the duty to deal with crimes already committed. *State v. Dilley,* 49 *N. J.* 460 (1967). And finally it is worth repeating that the immediate question is whether evidence of unimpeachable probative worth shall be suppressed with the obvious hurt to other individuals and to public values involved, not because the Fourth Amendment says that evidence illegally obtained shall not be used, but rather because the judiciary, believing it was unable to fashion a remedy for its breach, settled upon the sanction of suppression to compel obedience to its command. *State v. Davis, supra,* 50 *N. J.,* at 22.

Here we are not dealing with the privacy of a home, or of a place of business. We are not dealing with something which is immobile and is thereby limited in its usefulness to the criminal element. Rather the subject is a motor vehicle, which, for all its blessings, is high among the agencies of crime. The automobile is perfectly suited for that use. It provides cover for weapons, contraband, and the fruits of crime. It supplies a capacity to strike without warning and to leave without trace. *No discussion of crime can ignore the automobile, or the fact that the incidence of crime is hinged directly to the amount of privacy we accord it.* [*Id.* at 81–82 (emphasis supplied)]

He expressed the same thought in *State v. Zito, supra:*

Suppression is a judge-made device to deter future acts of insolence in office rather than to rectify a wrong already done. It must not be overlooked that the contest is between the first right of the individual — the right to be protected from crime — and the right of the individual to be free from an unreasonable search and seizure, and that when criminals are set loose because patent evidence of their guilt is suppressed, a heavy price is exacted, not from an abstraction called the State or the police or society, but from law-abiding individuals whose right to be protected is thereby impaired. [54 *N. J.* at 210–211]

Chief Justice Weintraub's analysis has been firmly embedded in our jurisprudence. *State v. De Simone,* 60 *N. J.* 319, 324 (1972) ; *State v. McNair,* 60 *N. J.* 8, 12 (1972) ; *State v. Gray,* 59 *N. J.* 563, 567 (1971) ; *State v. Carter,* 54 *N. J.* 436, 448 (1969), *cert.* den. 397 *U. S.* 948, 90 *S. Ct.* 969, 25 *L. Ed.* 2d 130 (1970) ; *State v. Barnes,* 54 *N. J.* 1, 10 (1969), *cert.* den. 396 *U. S.* 1029, 90 *S. Ct.* 580, 24 *L. Ed.* 2d 525 (1970) ; *State v. Campbell,* 53 *N. J.* 230, 233 (1969) ; *State v. McKnight,* 52 *N. J.* 35, 58 (1968). I cannot subscribe to its rejection.

Chief Justice Hughes joins in this opinion.

Hughes, C. J., and Pashman and Schreiber, JJ., concurring in the result.

*For reversal*—Chief Justice Hughes, Justices Sullivan, Pashman, Clifford, Schreiber and Handler and Judge Conford—7.

*For affirmance*—None.